**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | : |
| | : |
| **v.** | : **3:15-CR-00174** |
| | : **(JUDGE MARIANI)** |
| **AARON BANGAROO,** | : |
| | : |
| **Defendant.** | : |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court are the Pre-Trial Motions of the Defendant, Aaron

Bangaroo. (Doc. 23).

On August 18, 2015, a federal grand jury returned an indictment charging Bangaroo

with the following offenses:

- Distribution and Possession with Intent to Distribute Heroin on or about June 26, 2015, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count 1);

- Distribution and Possession with Intent to Distribute Heroin on or about June 30, 2015, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count 2);

- Possession with Intent to Distribute Heroin on or about July 1, 2015, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count 3);

- Possession with Intent to Distribute Cocaine on or about July 1, 2015, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count 4);

- Convicted Felon in Possession of Firearms on or about July 1, 2015, in violation of 18 U.S.C. § 922 (g)(1) (Count 5);

- Possession of Firearms in Furtherance of a Drug Trafficking Crime on or about July 1, 2015, in violation of 18 U.S.C. § 924(c) (Count 6).

(Doc. 1).

On September 3, 2015, Bangaroo appeared before Magistrate Judge Joseph

Saporito wherein he entered a plea of not guilty to the indictment and was ordered detained.

(Docs. 13, 14). Defendant thereafter filed "Pre-Trial Motions" (Doc. 23), with an

accompanying brief (Doc. 23-1), setting forth, *inter alia*, thirteen motions titled as follows:

1. Motion that the Prosecution be Required to Reveal Material that Would in its Nature be Exculpatory of Guilt and/or Mitigating of Punishment and that the Duty to Reveal Such Material be a Continuing one Throughout the Case.

2. Motion to Compel the Prosecution to Take Steps to Learn of any Evidence Favorable to the Defendant that is Known to Other Persons Acting for the Government Team, e.g. the Police.

3. Motion to Require the Government to Reveal any Agreement Between any Agent or Agency of the Government and any Government Witness.

4. Motion to Disclose the Identity of the Government's Informants.

5. Motion to Require the Government to Produce the Government's Informant for Trial.

6. Motion to Disclose the Present Whereabouts of the Government's Informants for Purposes of a Defense Subpoena.

7. Due Process Motion for Investigative Funds to Assist the Indigent Defendant and Defense Counsel in Preparing and Presenting the Defense.

8. Motion to Suppress Illegally Obtained Statement/Confession and for Hearing.

9. Motion to Suppress Confession of Co-Defendant.

10. Motion to Suppress Evidence Intentionally Seized Pursuant to a Search Warrant Issued Based upon an Affidavit which on its Face Failed to Establish Probable Cause and for Hearing.

11. Motion to Compel the Government to Produce Statements of Government Witnesses for Discovery and Inspection Prior to Defense Cross-Examination of Each Such Witness.

12. Motion to Prevent Sentence Based in Whole or Part on Evidence of any Conviction that is not Alleged in the Charging Instrument and Proved Beyond a Reasonable Doubt.

13. Motion for Leave to File Additional Motions.

(Doc. 23). The United States timely filed a brief in opposition to Defendant's motions (Doc. 24).

In 2016, the Court held several conference calls with counsel for the parties. As a result of a conference call held on September 28, 2016, the Court issued an Order providing Defendant an additional 30 days to engage in further plea discussions with the United States and obtain advice and counsel as to the effect of the pending criminal proceedings on Bangaroo's ability to remain in the United States. The Court further ordered that, following the expiration of the 30 day extension, should counsel notify the Court that resolution of the defendant's outstanding pre-trial motions was necessary, counsel should be prepared to set forth their respective positions as to whether an evidentiary hearing and/or oral argument should be held with respect to one or more of the motions. (Doc. 30). On October 31, 2016, the Court held another conference call wherein Defendant's counsel informed the Court that no resolution had been reached and therefore requested an evidentiary hearing be held on his first motion, at which time he would call one witness in support of that motion, and that

3

oral argument be held on the remaining motions. The Court issued an Order scheduling an evidentiary hearing and oral argument in this action. (Doc. 34).

On December 2, 2016, the Court held an evidentiary hearing on Defendant's "Motion that the Prosecution be Required to Reveal Material that would in its Nature be Exculpatory of Guilt and/or Mitigating of Punishment and that the Duty to Reveal such Material be a Continuing one Throughout the Case" and oral argument on Defendant's additional 12 motions. On this day, despite Defendant's request for an evidentiary hearing on his first motion, he informed the Court that he did not "think we are going to have an evidentiary hearing because [he did not] have a witness to provide testimony" and therefore "this will be strictly argument on all 13 motions." The parties thereafter set forth their respective positions on the pending motions.

## II. ANALYSIS

### A. Motions IV, V, and VI – "Motion to Disclose the Identity of the Government's Informants"; "Motion to Require the Government to Produce the Government's Informant for Trial"; "Motion to Disclose the Present Whereabouts of the Government's Informants for Purposes of a Defense Subpoena"

The Court will begin its analysis with Motions IV, V, and VI as the analysis of these motions is applicable to this Court's examination of several of Defendant's other motions.

In motions numbered IV, V, and VI, the Defendant asks the Court to order the Government to disclose the identity of the Government's informants (IV); to require the Government to produce the Government's informant for trial (V); and to disclose the present whereabouts of the Government's informants for purposes of a defense subpoena (VI).

4

In support of these motions, Defendant argues that there is a "genuine dispute as to whether 'Ace' is the same person as the Defendant herein, Aaron Bangaroo." (Doc. 23-1, at 5). Defendant further argues that the Government's confidential sources and confidential informant would testify that "Ace" is not the Defendant "or that they mistakenly have named him as such" and thus the "presence of the informant/sources is crucial to the Defendant's defense." (*Id.*). Defendant provides no further argument to support his assertions or any case law demonstrating an entitlement to some, or all, of this information.

In response to these motions, the Government cites to *Roviaro v. United States,* 353 U.S. 53, 59 (1957) and *McCray v. State of Illinois,* 386 U.S. 300, 309 (1967), for the proposition that it is well-established that the Government is permitted, absent exigent circumstances, to withhold the identity of informants. (Doc. 24, at 13).

In *Roviaro,* the Supreme Court found that "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." 353 U.S. at 60-61. Nonetheless, "no fixed rule with respect to disclosure [of the identity of an informant] is justifiable." Instead,

[t]he problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id.* at 62.

5

A decade later, in *McCray*, the Supreme Court again addressed the privilege against disclosure of the identity of persons supplying the Government with information concerning the commission of crimes and set forth the reason for this privilege:

> Communications of this kind ought to receive encouragement. They are discouraged if the informer's identity is disclosed. Whether an informer is motivated by good citizenship, promise of leniency or prospect of pecuniary reward, he will usually condition his cooperation on an assurance of anonymity – to protect himself and his family from harm, to preclude adverse social reactions and to avoid the risk of defamation or malicious prosecution actions against him. The government also has an interest in nondisclosure of the identity of informers. Law enforcement officers often depend upon professional informers to furnish them with a flow of information about criminal activities. Revelation of the dual role played by such persons ends their usefulness to the government and discourages others from entering into a like relationship.

> That the government has this privilege is well established and its soundness cannot be questioned.

*McCray*, 386 U.S. at 308 (quoting 8 Wigmore, Evidence § 2374 (McNaughton rev. 1961)).

Prior to engaging in the *Rovario* balancing test, the defendant has the burden of setting forth and establishing a specific need for disclosure of the identity of the confidential informant. *See United States v. Jiles*, 658 F.2d 194, 197-198 (3d Cir. 1981) (stating that "the first step in determining whether the identity of an informant must be disclosed is to ascertain what need, if any, the defendant has alleged for disclosure", and that this burden to show the need for disclosure is on the defendant, and the "second part of the '*Roviaro* test' requires a balancing of the [Defendant's] interest in disclosure against the Government's interest in maintaining the confidentiality of its informant."). In meeting its

6

burden, the defendant may not merely rely on speculation or vague assertions. *See U.S. v. Bazzano*, 712 F.2d 826, 839 (3d Cir. 1983) ("[Defendant's] argument, as to why the identity of the informant here would be useful, is vague. '[M]ere speculation as to the usefulness of the informant's testimony to the defendant is insufficient to justify disclosure of his identity.' So far as appears, the informant's role in this case was nothing more than that of allegedly providing the police with probable cause for conducting their search. . . . The evidence of [Defendant's] guilt consisted primarily of the physical evidence seized during the search. Where an informant's role was in validating a search, disclosure of his identity is not required. [Defendant] has failed to present a convincing argument that the informant played any more important role in the Government's case or in his defense." (internal citations omitted)); *Jiles*, 658 F.2d at 197 ("The mere speculation that an eyewitness may have some evidence helpful to defendant's case is not sufficient to show the specific need required by *Roviaro*."); *United States v. Brenneman*, 455 F.2d 809, 811 (3d Cir. 1972) (Finding unpersuasive Defendant's "speculation that testimony or information from the informant might have been used to impeach or cross-examine [a witness] and 'might even have led to the [defendant's] being able to raise the issue of entrapment'".).

In this case, the Government contends that Bangaroo's reason for seeking disclosure of the confidential sources/informants is "speculative at best." (Doc. 24, at 15). While the Defendant disputes that he ever utilized the street name or nickname of "Ace", the Government points to other information in the Affidavit of Probable Cause which presents

facts which allowed Luzerne County Court of Common Pleas Judge Tina Gartley to find the informants credible and to issue a search warrant.

Specifically, a review of the Affidavit of Probable Cause (Doc. 24-1) issued in this matter sets forth a number of factual assertions which form the basis for the issuance of a search warrant. The affiants of the Affidavit of Probable Cause were Detectives Edward Palka and Richard Kotchik, both assigned to the Kingston Police Narcotics Unit at the time of the events at issue.

The detectives stated that they received information from two confidential sources (hereinafter "CS#1" and "CS#2").

According to the affiants, CS#1 provided the following information, as set forth in the second paragraph of the Affidavit:

- CS#1 could purchase heroin from a black male utilizing the alias "Ace";

- "Ace" lived on S. Gates Avenue in Kingston and drove a blue Chevy Trail Blazer;

- "Ace" deals heroin and crack cocaine and always carries a gun with him;

- "Ace" carries a gun because he was recently involved in a shootout in Wilkes-Barre;

- "Ace" recently moved to S. Gates Avenue with his girlfriend, Michelle, because he had been shot at in Wilkes-Barre;

- "Ace" previously lived on Parrish Street in Wilkes-Barre.

According to the affiants, CS#2 provided the following information, as set forth in the fourth paragraph of the Affidavit:

8

- CS#2 could purchase heroin from a black male known as "Ace";

- "Ace" utilizes cell phone number (570) 472-4670;

- "Ace" drives a gray SUV.

Based on the information provided by CS#1, Detective Palka traveled to the area of S. Gates Avenue in Kingston and witnessed a blue Chevy Trail Blazer and a gray Chevy Trail Blazer parked in front of the residence at 89 S. Gates Avenue in Kingston. A check of the blue Trail Blazer's registration indicated that the vehicle was owned by Aaron Bangaroo with a registered address of Parrish Street in Wilkes-Barre. A check of the gray Trail Blazer's registration indicated that this vehicle was registered to Michelle Sebolka of 89 S. Gates Avenue in Kingston. Detective Palka then contacted Officer Shane Yelland of the Wilkes-Barre Police Department who stated that he was familiar with Aaron Bangaroo, that Bangaroo does utilize the alias "Ace", and that Bangaroo and another male had been shot at over 20 times in Wilkes-Barre on April 6, 2015. Officer Yelland also confirmed that Bangaroo had provided his address as 273 Parrish Street, Wilkes-Barre. A criminal history run on Bangaroo showed arrests for firearms and drugs charges. (*See* Affidavit of Probable Cause, ¶ 3).

In addition, paragraphs five through nine of the Affidavit of Probable Cause described two "controlled purchases" in which the police used a Confidential Informant ("CI") to purchase heroin from the defendant on June 26, 2015 and June 30, 2015.

On June 26, 2015, a CI who had worked as a CI in the past and had previously provided "reliable information that led to the arrest of narcotics offenders", placed a telephone call to Bangaroo at telephone number 570-472-4670, and made arrangements to meet with Bangaroo. After being searched for contraband, the CI was provided with identifiable U.S. currency. The CI was transported by Detective Kotchik to Northampton Street where the CI exited the vehicle and walked towards 89 S. Gates Avenue, in constant view of Detectives. The Detectives watched Bangaroo exit the back door at 89 S. Gates Avenue and walk towards the front of the home. Detective Palka witnessed Bangaroo meet with the CI in front of the home and the CI and Bangaroo were seen making a hand-to-hand transaction. Bangaroo was then observed entering the front door of 89 S. Gates Avenue. The CI was picked up by Detective Palka and transported to the Kingston Police Department where he turned over heroin packaged in white bags stamped "Polo Viejo".

On June 30, 2015, detectives conducted a second controlled purchase from Bangaroo. On that day, a CI placed a call to Bangaroo at (570) 472-4670 and arranged to purchase heroin from Bangaroo. After being searched for contraband, the CI was provided identifiable U.S. currency and transported to the meeting location, where he was under constant surveillance by Detective Kotchik. Officer Mehovich observed Bangaroo exit the front door of 89 S. Gates Avenue, proceed directly to the meeting location, and meet with the CI. Detective Kotchik watched Bangaroo hand the CI an item and the CI hand Bangaroo the currency provided to him by the detectives. After the CI and Bangaroo separated, Detective

Kotchik met with the CI, who turned over packets of heroin. Officer Mahovich observed Bangaroo proceed back to 89 S. Gates Avenue and enter the front door.

Based on the information set forth in the Affidavit of Probable Cause, the investigators applied for and were granted a search warrant for the property, residence, and curtilage of 89 S. Gates Avenue, Kingston, PA. The Receipt/Inventory of Seized Property (Doc. 24-1), dated July 1, 2015, records 282 white packets of heroin, 15 dime bags containing a white chunky substance, two firearms, ammunition, and cash as having been seized as a result of the execution of the search warrant. Various documents in the name of Aaron Bangaroo were also found inside the residence during the search.

According to the Government, "[d]uring the execution of the search warrant, Bangaroo's girlfriend, Michelle Sebolka, arrived at the scene" at which time she "indicated that Bangaroo had been residing with her at the residence for about a month" and "stated that she knew Bangaroo was 'dealing drugs'". (Doc. 24, at 18).

The Court agrees that based on the facts set forth above, there was a substantial basis upon which the issuing officer, in this case, Judge Gartley, could find facts showing probable cause that Bangaroo was engaged in unlawful drug activity and that the facts set forth in the Affidavit of Probable Cause supplied to the Judge were supported by both credible informants and corroborative police work.

As previously stated, the first step a Court must take "in determining whether the identity of an informant must be disclosed is to ascertain what need, if any, the defendant

has alleged for disclosure." *Jiles*, 658 F.2d at 197-198. This burden to show the need for disclosure is on the defendant. *Id*. Here, Defendant merely asserts, in cursory fashion, that he "believes" that the confidential sources and confidential informant "will testify that 'Ace' is not the Defendant . . . or that they mistakenly have named him as such." (Doc. 23-1, at 5). Here, the Government contends that based on both the direct and circumstantial evidence, which the Court set forth above, "there can be little doubt that Aaron Bangaroo is the individual known to CS#1 and CS#2 as 'Ace.'" (Doc. 24, at 18). Regardless, the Government argues that whether Bangaroo does or does not use the name "Ace" is irrelevant to the case at bar. (*Id*. at 20). This is so because the police "personally observed Aaron Bangaroo engage in two sales of heroin, obtained a search warrant for the residence he exited prior to the transactions and re-entered after the transactions, and found suspected heroin, firearms and other contraband in that residence." (*Id*.).

Here, the Court agrees that whether Aaron Bangaroo is the individual known to CS#1 and CS#2 as "Ace" is ultimately irrelevant. The other information provided by the confidential sources supports Bangaroo's identity; for instance, the identification of Bangaroo's street address in Wilkes-Barre, his girlfriend's name and residence, where Bangaroo was now living, the type of car Bangaroo drove, the fact that he had recently been in a shooting in Wilkes-Barre, and his phone number. In light of the detailed information provided by the confidential sources, in particular CS#1, there is no genuine dispute as to whether Bangaroo is the individual to whom the confidential sources were referring. Even if

12

a genuine dispute did exist as to Bangaroo's aliases, the surveillance, controlled buys,

lawful execution of the search warrant, and items recovered provide the basis for the

charges now pending against Bangaroo. Defendant provides no basis for his assertion that

the confidential sources and confidential informant may testify that Bangaroo is not "Ace."

The unsupported assertion amounts to nothing more than mere speculation. As a result,

Defendant has failed to carry his initial burden of demonstrating his need for the disclosure

of the identities of the confidential sources or informant.[1]

The government also asserts that it "has concerns in this case regarding the safety

of confidential sources of information who have cooperated with law enforcement in this

investigation." (Doc. 24, at 20). In support of this assertion, the government points to the

pretrial services report in this matter which indicated that despite Bangaroo being a

previously convicted felony drug trafficker and being prohibited from possessing firearms,

Bangaroo is now charged "not only with serious drug trafficking crimes, but also with

possession of two firearms in furtherance of drug trafficking activity and being a convicted

felon in possession of two firearms", one of which was previously reported stolen. (Id. at 20-

21). The government's concern also purportedly stems from "the pretrial services report

and NCIC report indicat[ing] that Bangaroo has utilized multiple aliases, dates of birth and

social security numbers; has arrests in multiple states; has previous criminal convictions;

---

[1] Defendant's argument with respect to the need for the disclosure of the confidential informant's
identity would fail regardless of whether Defendant had set forth a basis for his assertion that "Ace" is not
Bangaroo. The Affidavit of Probable Cause only states that CS#1 and CS#2 referred to Bangaroo as
"Ace." The Affidavit does not state that the CI also knew Bangaroo as "Ace" and therefore no argument
can be made that the CI was "mistaken" in his identification of Bangaroo as "Ace."

has engaged in criminal activity while under supervision; and has ties to a foreign country."
(*Id.* at 21).

Even if the Court were to apply the *Roviaro* balancing test, a case-specific analysis demonstrates that Defendant is not entitled to the disclosure of the requested identities. As explained by the Government, Bangaroo may pose a danger to the safety of the confidential sources and confidential informant. Further, as set forth above, the identity of the individuals does not interfere with Defendant's right to prepare his defense. Whether Bangaroo is known as "Ace" to the confidential sources has little import on whether he committed the crimes with which he is charged. Finally, the revelation of the individuals' identities, and particularly that of the confidential informant "who has worked as a CI in the past and had provided reliable information that led to the arrest of narcotics offenders" (Affidavit of Probable Cause, ¶ 5), would discourage these individuals, as well as other present and future informants and sources from coming forward or aiding the government in exposing criminal activities. Thus, "taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors", *Roviaro*, 353 U.S. at 62, the Court finds that the balancing test weighs in favor of preserving the identities of the confidential sources and confidential informant.

For the forgoing reasons, the Court will deny Defendant's Motions IV, V, and VI.[2]

---

[2] The Court notes that during oral argument, when Defense counsel was questioned by the Court with respect to whether he wanted to submit argument on Motions IV-VI, Defense counsel responded: "I presume that the government is not going to expose their names or their identities so I'm not going to argue that." It is unclear whether, at that time, defense counsel was withdrawing these motions and thereby

14

## B. Motion X – "Motion to Suppress Evidence Intentionally Seized Pursuant to a Search Warrant Issued Based upon an Affidavit which on its Face Failed to Establish Probable Cause and for Hearing"

The Court will next address Motion X as our analysis of this motion directly relates to our analysis in Section II(A), *supra*, as well as the description of the contents of the Affidavit of Probable Cause set forth extensively therein.

Bangaroo's tenth motion, entitled "Motion to Suppress Evidence Intentionally Seized Pursuant to a Search Warrant Issued Based Upon an Affidavit Which on its Face Failed to Establish Probable Cause and for Hearing" (Doc. 23, at 11), requests that all evidence obtained pursuant to the search of 89 S. Gates Avenue, Kingston, PA on July 1, 2015 be suppressed. (Doc. 23-1, at 10).[3]

Defendant, citing to *Stanford v. Texas*, 379 U.S. 476 (1965), asserts that "the Affidavit must set forth sufficient information to justify a finding that probable cause exists, which means, when a person of reasonable caution would be justified in concluding that evidence of criminal conduct is in the stated place to be searched." (Doc. 23-1, at 13). Defendant correctly cites the standard of review for a decision to issue a search warrant as whether there is a substantial basis for the conclusion of the issuing judge that there is a fair

waiving any argument on the issues, or simply stating that he had no further argument other than that set forth in his motions and accompanying brief.

[3] To the extent that this motion requests a hearing, the Court provided Defendant the opportunity for a hearing during the conference call held with counsel on October 31, 2016. At that time, counsel for both parties were asked to set forth their respective positions as to whether they wanted an evidentiary hearing and/or oral argument on one or more of the defendant's motions. At that time, Defendant's counsel only requested a hearing with respect to his first motion and stated that oral argument could be held on the remaining motions.

probability that contraband or evidence of a crime will be found in a particular place. (*Id.*)

(citing *Illinois v. Gates*, 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

Defendant then argues as follows:

> The information contained in the Affidavit in this case is wholly lacking in particularized facts and circumstances that would enable the magistrate to make an independent probable cause determination. The Affidavit in this case relies heavily on information from two (2) different Confidential Sources (CS) and another Confidential Informant (CI), who allegedly supplied information regarding someone known as "Ace". However, the Affidavit fails to sufficiently establish the reliability of the alleged CS or CI as to Aaron Bangaroo being known as "Ace". Furthermore, there is no indication of any follow up investigation, which was ostensibly [*sic*] would corroborate the informants' claim that Aaron Bangaroo was the same person as "Ace".

(Doc. 23-1, at 13-14).

Defendant complains that the Affidavit relied on the two Confidential Sources but that the affiants cite no past history to judge the credibility of the Confidential Sources. Defendant further complains that while the Affidavit alleges that "'[t]he CI had worked as a CI in the past and had provided reliable information that led to the arrest of narcotics offenders,'[ t]he Affiants do not state how many previous times they have used this CI over an unstated period of time, or otherwise stating or proving this CI is familiar with narcotics and its packaging." (Doc. 23-1, at 15). Additionally, Defendant asserts that "there is no allegation here that anyone has ever been convicted based upon information from this CI," and "there is no claim that the Informant's information was important or critical to any of the prior arrests or seizures or even that the Informant was able to predict where drugs would be found." (*Id.*).

16

Simply stated, Defendant's motion attacks the reliability of the Confidential Sources

and Confidential Informant whose statements were, in part, the basis for the issuance of a

Search Warrant of Bangaroo's premises. Thus, Defendant argues that "[t]he Judge erred in

issuing a search warrant based upon the unsupported and conclusory statements of the

Affiant as to the alleged reliability of this CI and the other two (2) confidential sources."

(Doc. 23-1, at 18).[4]

On the basis of the affiants' sworn description of the events, the Court finds it clear

that Judge Gartley had probable cause to issue the search warrant. Indeed,

> [t]he task of the issuing magistrate is simply to make a practical, common-
> sense decision whether, given all the circumstances set forth in the affidavit
> before him, including the veracity and basis of knowledge of persons
> supplying hearsay information, there is a fair probability that contraband or
> evidence of a crime will be found in a particular place. And the duty of a
> reviewing court is simply to ensure that the magistrate had a substantial basis
> for concluding that probable cause existed.

*Illinois v. Gates*, 462 U.S. at 238-239 (internal quotations and alterations omitted).

Here, Defendant cannot rest on blanket assertions that the Confidential Sources and

Confidential Informant lacked reliability. With respect to the Confidential Sources, the

affiants in this case did not simply rely on the information provided by these two individuals

when they applied for the search warrant – rather, the information provided was personally

verified by Detective Palka who, among other things, examined the area of S. Gates

---

[4] Furthermore, to the extent that Defendant relies on the same arguments with respect to the
Confidential Sources and Confidential Informant's knowledge, or lack thererof, of Bangaroo as "Ace" in this
motion as he did in Motions IV, V, and VI, the Court rejects those arguments as meritless for the reasons
set forth in this Court's analysis of Defendant's Motions IV, V, VI, *supra*.

17

Avenue, ran the registration of the cars parked in front of the residence, and contacted Officer Yelland to obtain more information about Bangaroo. As to the Confidential Informant, even assuming that this person had not provided "reliable information" in the past, in this case, the interactions between the CI and Bangaroo, in the form of two controlled purchases of purported heroin, were personally witnessed by police detectives. Finally, in a case like the once currently before this Court, where an informant's information does not stand alone and "is verified by independent dependent personal observations by police, probable cause may be established." *U.S. v. Singleton*, 439 F.2d 381, 384 (3d Cir. 1971).

In sum, Defendant ignores that the Affidavit does not solely rely on the information obtained from the Confidential Sources and Confidential Informant, but instead includes a description of the actions taken by the police officers to corroborate the information provided by the Confidential Sources and Confidential Informant.[5] Specifically, the actions taken by the affiants include the following:

---

[5] The Court is troubled by Defendant's blatant misrepresentations of what occurred in the present situation. For example, Defendant makes assertions such as "the allegations concerning the presence of contraband on the premises were lacking in sufficient detail, *and there is no suggestion that there had been any attempt to conduct an investigation to corroborate the information allegedly supplied by the informant.*" (Doc. 23-1, at 15)(emphasis added). In fact, in this case, as discussed both in the Section II(A) and the present Section, the affiants took several steps to corroborate the information provided to them by the Confidential Sources and the Confidential Informant, including traveling to the area of S. Gates Avenue, running vehicle registration records, contacting a Wilkes-Barre police officer, performing two controlled buys from Bangaroo which were personally observed by police officers, and field testing the substances inside the bags/packets given to the CI by Bangaroo.

- Detective Palka traveled to the area of S. Gates Avenue in Kingston and witnessed a blue Chevy Trail Blazer and a gray Chevy Trail Blazer parked in front of the residence at 89 S. Gates Avenue in Kingston.

- A check of the blue Trail Blazer's registration indicated that the vehicle was owned by Aaron Bangaroo with a registered address of Parrish Street in Wilkes-Barre. A check of the gray Trail Blazer's registration indicated that this vehicle was registered to Michelle Sebolka of 89 S. Gates Avenue in Kingston.

- Detective Palka contacted Officer Shane Yelland of the Wilkes-Barre Police Department who stated that he was familiar with Aaron Bangaroo, that Bangaroo utilizes the alias "Ace", and that Bangaroo and another male had been shot at over 20 times in Wilkes-Barre on April 6, 2015. Officer Yelland also confirmed that Bangaroo had provided his address as 273 Parrish Street, Wilkes-Barre.

- A criminal history run on Bangaroo showed arrests for firearms and drugs charges.

- As discussed in more detail in Section II(A), the police conducted two "controlled purchases" in which the Confidential Informant was used to purchase purported heroin from the defendant on June 26, 2015 and June 30, 2015. During the first controlled purchase, the Detectives watched Bangaroo exit the back door at 89 S. Gates Avenue and walk towards the front of the home. Detective Palka witnessed Bangaroo meet with the CI in front of the home and the CI and Bangaroo were seen making a hand-to-hand transaction. Bangaroo was then observed entering the front

19

door of 89 S. Gates Avenue. The CI was picked up by Detective Palka and transported to the Kingston Police Department where he turned over heroin packaged in white bags stamped "Polo Viejo".

- During the second controlled purchase, the CI was reportedly under constant surveillance by Detective Kotchik; Officer Mehovich observed Bangaroo exit the front door of 89 S. Gates Avenue, proceed directly to the meeting location, and meet with the CI; and Detective Kotchik watched Bangaroo hand the CI an item and the CI hand Bangaroo the currency provided to him by the detectives. After the CI and Bangaroo separated, Detective Kotchik met with the CI, who turned over packets of heroin and Officer Mahovich observed Bangaroo proceed back to 89 S. Gates Avenue and enter the front door.

Under the *Gates* "totality of the circumstances" test, the issue is whether "given all the circumstances set forth in the affidavit before [the magistrate judge] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. In determining this, "probable cause to search can be based on an accumulation of circumstantial evidence that together indicates a fair probability of the presence of contraband at the home of the arrested." *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002). "The supporting affidavit must be read in its entirety and in a common sense and nontechnical manner." *U.S. v. Conley*, 4 F.3d 1200, 1206 (3d Cir. 1993).

"Furthermore, '[t]he issuing judge or magistrate may give considerable weight to the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.'" *U.S. v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000) (quoting *U.S. v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996)).

Although probable cause to arrest a suspect is a different inquiry from probable cause to search his home, "[i]f there is probable cause to believe that someone committed a crime, then the likelihood that that person's residence contains evidence of the crime increases." *Burton*, 288 F.3d at 103 (quoting *United States v. Jones*, 994 F.2d 1051, 1055-56 (3d Cir. 1993)). "[The Third Circuit], and several other courts of appeals, 'have held that evidence . . . is likely to be found where the [drug] dealers reside.'" *Id.* (quoting *Whitner*, 219 F.3d at 297-298 (collecting cases)). The Court qualified:

> Of course, even though we have recognized that it is a reasonable inference to conclude that drug dealers often store evidence of drug crimes in their residences, application of this inference is based on evidence supporting three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities.

*Id.* at 104.

Here, the evidence discussed thus far provides probable cause to believe that each of these premises has been met.

First, the evidence used to obtain the search warrant for 89 S. Gates Avenue, Kingston, PA, including the information provided by the two confidential sources, the confidential informant, and the police officers' personal observations of Bangaroo selling bags/packets of purported heroin to the CI, adequately supports the premise that Bangaroo was actually a drug dealer.

Next, the following evidence all supports the premise that Bangaroo was domiciled at 89 S. Gates Avenue: (1) CS#1's statement that "Ace" recently moved to his girlfriend's home on S. Gates Avenue after being shot at in Wilkes-Barre, (2) the shooting being confirmed by Officer Yelland of the Wilkes-Barre Police Department, (3) Detective Palka personally observing both Bangaroo and Sebolka's cars parked in front of the residence on S. Gates Avenue, (4) "Detectives" observing Bangaroo exit "the back door [of] 89 S. Gates Avenue" on June 26, 2015, conducting a drug transaction, and then "entering the front door of 89 S. Gates Avenue", and (5) on June 30, 2015, Officer Mahovich observing Bangaroo "exit the front door of the residence of 89 S. Gates Avenue" and then subsequently observing Bangaroo enter the front door of the same residence following other officers observing Bangaroo meet with the CI and exchange packets of purported heroin for cash.

Finally, the facts that a CS stated that Bangaroo lived with his girlfriend on S. Gates Avenue and drove a blue Chevy Trail Blazer, that Detective Palka saw a blue Chevy Trail Blazer in front of the residence on S. Gates Avenue registered to Bangaroo, and that Bangaroo was then twice observed leaving that home on S. Gates Avenue, meeting with

the CI, and then immediately returning to the S. Gates Avenue residence, and that on both occasions the items given to the CI purportedly contained heroin, provides a substantial basis for Judge Gartley to determine that there was a fair probability that Bangaroo's residence contained contraband. *See Burton*, 288 F.3d at 104 ("While we generally accept the common sense proposition that drug dealers often keep evidence of their transactions at home, that inference is much stronger when the home is the first place a drug dealer proceeds following such a transaction.").

Therefore, the information that the police acquired and set forth in the Affidavit of Probable Cause reviewed by Judge Gartley provided a substantial basis from which it was reasonable to infer that evidence of Bangaroo's drug activity was being stored at 89 S. Gates Avenue. Under the facts presented in the Affidavit of Probable Cause, the Court finds that the "totality of the circumstances" supports Judge Gartley's issuance of the search warrant and the Court will not second-guess the Judge's decision. (*See, e.g., United States v. Ritter*, 416 F.3d 256, 264 (3d Cir. 2005) ("The Supreme Court has clearly indicated that the conclusions of a neutral magistrate regarding probable cause are entitled to a great deal of deference by a reviewing court, and the temptation to second-guess those conclusions should be avoided.") (citing *Gates*, 462 U.S. at 236).

For the aforementioned reasons, Defendant's Motion X will be denied.

### C. Motion I – "Motion that the Prosecution be Required to Reveal Material that Would in its Nature be Exculpatory of Guilt and/or Mitigating of Punishment and that the Duty to Reveal Such Material be a Continuing one Throughout the Case"

Defendant's first motion is entitled "Motion that the Prosecution Be Required to

Reveal Material That Would In Its Nature Be Exculpatory of Guilt and/or Mitigating of

Punishment and That The Duty to Reveal Such Material Be a Continuing One Throughout

the Case." (Doc. 23, at 1). However, the actual argument in support of this motion does not

appear connected to the title of the motion. Instead, Defendant attacks the Search Warrant

Affidavit which was used as a basis to effect a search of the property and residence at 89 S.

Gates Avenue in Kingston, PA. (See Doc. 23-1, at 1-3).

Bangaroo contends that the Search Warrant was deficient because two "Confidential

Sources" who were relied upon in the Affidavit of Probable Cause could only describe the

individual from whom each purchased heroin as a black male utilizing the alias of "Ace". The

Defendant asserts that he has never been known as "Ace" and the statements of the

Confidential Sources do not state how each would know that Aaron Bangaroo is also known

as "Ace". Defendant then ends his argument with respect to Motion I with a request for

relief seeking material "that would in its nature be exculpatory of guilt and/or mitigating of

punishment and that the duty to reveal such material be a continuing one through the case."

(Id. at 3).[6]

---

[6] During oral argument, counsel for the defendant did expand on his request, arguing that the purpose of his first motion "is to, for instance, compel the government to provide the information regarding Ms. Sebolka so she could be brought in to testify." This is addressed in Section II(A).

24

Defendant cites no specific case law in support of his position other than string-citing, with no pin-cites, Supreme Court case law which set forth the well-established need for the prosecution to turn over exculpatory material as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963) and material that would be useful for impeachment purposes of any Government witness, *Giglio v. United States*, 405 U.S. 150 (1972).

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the Government has a continuing obligation to turn over evidence favorable to the Defendant, "where the evidence is material either to guilt or punishment." *Id.* at 87. In *Giglio*, the Supreme Court further required that the Government disclose any impeachment information that it possesses regarding its own witnesses, such as promises for leniency made in return for testimony. *See id.* at 154-55.

In response to Defendant's motion, the Government cites to its discovery obligations set forth in Federal Rules of Criminal Procedure 16 and 12(b)(4)(B) and the *Jencks Act*, 18 U.S.C. § 3500, as well as its duty to provide the defendant any material in the government's possession which tends to exculpate the defendant, as mandated by *Brady, Giglio,* and their progeny. (Doc. 24, at 6-8). Accordingly,

> [i]n the present matter, the government has provided a number of items of discovery to previous defense counsel, including copies of multiple incident reports from ATF and the Kingston Police Department; the defendant's criminal history record; a copy of the search warrant application, search warrant, affidavit of probable cause and search warrant inventory; copies of the criminal complaint and affidavit of probable cause filed in state court; and other items. The government anticipates that additional items of discovery, such as laboratory reports and photographs, will be provided to present defense counsel when they are received by the government. Moreover, the government will continue to review its files and will continue to produce the

25

material to which the defendant is entitled under Rule 16, the *Jencks Act*, and *Brady/Giglio* and their progeny.

(Doc. 24, at 8-9). During oral argument with the parties in December, 2016, Assistant U.S. Attorney O'Hara again represented to the Court that he had turned over all of the *Brady* material in his possession, an assertion defense counsel stated he did not dispute. At that time, the Government also represented that it was fully prepared to turn over any *Jencks* Act information and *Giglio* material at the appropriate time.

In light of the government's assertions and Defendant's lack of dispute as to the Government's representation of what it has turned over and will continue to turn over as necessary and at the appropriate time, the Court will deny without prejudice Defendant's first motion to the extent that it is seeking *Brady, Giglio*, and *Jencks* Act materials. Defendant's overbroad motion and complete lack of clarity with respect to what information he is seeking prevents this Court from engaging in any further analysis of this motion or from providing the defendant with any of other relief that he may be seeking.

## D. Motion II – "Defendant's Motion to Compel the Prosecution to Take Steps to Learn of Any Evidence Favorable to the Defendant that is Known to Other Persons Acting for the Government Team, e.g., the Police"

Without citing any case law or again specifically explaining what he is seeking, Defendant's second motion broadly requests that the Government "take steps to determine the identity of 'Ace' and determine if [Bangaroo] is known to the informants/government witnesses as 'Ace'". (Doc. 23-1, at 4). The Government states that, while confusing, it considers Defendant's motion as one for information under *Brady*. (Doc. 24, at 11).

26

"The holding in *Brady v. Maryland* requires disclosure only of evidence that is both favorable to the accused and 'material either to guilt or to punishment.'" *U.S. v. Bagley*, 473 U.S. 667, 674 (1985). As such, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case" and disclose that information to the defendant. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (citing *Brady*, 373 U.S. at 87).

Consistent with its obligations under *Brady*, the Government has stated it will "contact the Kingston Police Department to seek to learn of any evidence favorable to the accused." (Doc. 24, at 11).

Therefore, to the extent that the Government has not already done so, the Court will order the Government to turn over all information that meets the *Brady* standards for disclosure, and to fully comply with its duty to learn of any as-yet-unknown evidence properly disclosable under *Brady*. However, in light of Assistant U.S. Attorney O'Hara's representation to the Court in December, 2016, that he had turned over all of the *Brady* material in his possession, the Court will deny Defendant's motion without prejudice.

## E. Motion III – "Motion to Require the Government to Reveal any Agreement Between any Agent or Agency of the Government and any Government Witness"

Using once again brief and conclusory assertions, Defendant's brief in support of his third motion states, in its entirety, that the defendant "believes that the Government and/or the Commonwealth have entered into agreements of leniency as to sentencing or charges with witnesses and/or informants in the instant case" and, citing generally to *Giglio*, that he

27

is "entitled to learn of all such agreements, as they go to the witness' credibility and can be used by the Defendant on cross examination." (Doc. 23-1, at 4).

In response, the Government states that it "intends to turn over its *Jencks* material to the defendant at least three days prior to trial, as is the custom in this District, along with additional impeachment material, if any, under *Brady/Giglio*." (Doc. 24, at 12). Nonetheless, the Government "retain[s] its rights under the *Jencks* Act and *Brady/Giglio* to withhold the production of *Brady/Giglio* material consistent with the applicable law, until after the witness testifies. . . ." (*Id.*).

The Supreme Court in *Giglio* explained that *Brady* requirements include an obligation that the Government disclose any impeachment information that it possesses regarding its own witnesses, such as promises for leniency made in return for testimony. *Giglio*, 405 U.S. at 154-155. The Third Circuit has explained that due process requires only that *Brady* material be disclosed to the defense "in time for its effective use at trial." *U.S. v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983). In *Higgs*, the Circuit found that the *Brady* material at issue:

> was information that [Defendants] could use on cross-examination to challenge the credibility of government witnesses. For that type of material, we think [Defendants'] right to a fair trial will be fully protected if disclosure is made the day that the witness testifies. Disclosure at that time will fully allow appellees to effectively use that information to challenge the veracity of the government's witnesses.

*Id.*

Here, Defendant cites no authority for the proposition that he is entitled to any agreements between the Government and/or the Commonwealth and any witnesses and/or

28

informants prior to the time the Government has agreed to turn over this information. Nor does Defendant explain why this information is needed prior to the time that the Government has stated it will produce it. Further, Defendant's motion requests the agreements for the purpose of cross-examination. The agreements are not being requested for a purpose which would require that the defendant have more time to investigate a witness.[7] Thus, in accordance with *Giglio* and Third Circuit precedent and in light of the information currently before this Court and the Government's representations, it appears that the disclosure of any agreements at the time set forth by the Government will not prevent the defendant from "its effective use at trial." *See also, U.S. v. Villarman-Oviedo*, 325 F.3d 1, 13 (1st Cir. 2003) (finding that the Government did not violate *Brady*, *Giglio*, or the *Jencks* Act when it turned over a witness's plea and cooperation agreement four days before trial).

Defendant's motion will therefore be denied without prejudice but subject to the restrictions on when such material must be turned over under *Jencks* and *Brady/Giglio*.

## F. Motion VII – "Motion For Investigative Funds to Assist the Indigent Defendant and Defense Counsel in Preparing and Presenting the Defense"

In his next motion, Bangaroo asserts that he is "indigent insofar as being able to afford the cost of a reasonable defense to the instant charges." (Doc. 23-1, at 6). As such,

---

[7] *See Higgs*, 713 F.2d at 42-44 (The requested information was not being turned over to allow defendants to engage in a pretrial investigation of the general reputation for truthfulness of the individuals in the community but was instead provided solely for purposes of cross-examination); *see also, U.S. v. Nixon*, 418 U.S. 683, 701 (1974) ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial.").

29

the defendant requests that the Court order that "the Defendant be provided with the funds

necessary to employ [an] investigator and expert . . . to enable him to prepare an adequate

and effective defense or to authorize defense counsel's hiring of same at the Government's

expense." (*Id.* at 8). Specifically, Defendant contends that a criminal investigator is

necessary "to properly investigate the facts, locate and interview witnesses" and that a

Presentence Investigation Expert is necessary because "[a] presentence investigation is

necessary to enable the Defendant (in the event he is convicted) to present this Honorable

Court with enough information to insure [*sic*] that it will make a reasoned determination as to

the Defendant's possible sentence and alternative[s] available." (Doc. 23-1, at 7-8).

To obtain the appointment of an expert, an indigent defendant must "offer more than

undeveloped assertions that the requested assistance would be beneficial." *Caldwell v.*

*Mississippi,* 472 U.S. 320, 323 n.1 (1985).[8] Here, Defendant's request that the Court

---

[8] *See also, Lewis v. Gov. of Virgin Islands,* 77 F.Supp.2d 681, 685 (D.V.I. 1999).
Although numerous courts have held that trial judges may appoint investigators to assist
indigent defendants in securing due process or the effective assistance of counsel,
defendants must explain precisely why such assistance is necessary. *See, e.g., Caldwell
v. Mississippi,* 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (declining to
decide what defendant would have to demonstrate under the Constitution to receive
investigator's assistance because he "offered little more than undeveloped assertions that
the requested assistance would be beneficial"); *United States v. Gonzales,* 150 F.3d 1246,
1251 n. 4 (10th Cir. 1998) ("defendants must provide the . . . court with explicit detail
showing why the requested services are 'necessary' to an adequate defense and what the
defendant expected to find"); *Mason v. Arizona,* 504 F.2d 1345, 1352 (9th Cir. 1974)
(concluding that state trial court did not violate defendant's due process and equal
protection rights by refusing to appoint an investigator, since such appointments "depend[ ]
upon the need as revealed by the facts and circumstances of each case," and defendant
had not explained the basis of his request).
*Id.* at 685. *See also, U.S. v. Gadison,* 8 F.3d 186, 191 (5th Cir. 1993) ("To justify the authorization of
investigative services under § 3006A(e)(1), a defendant must demonstrate with *specificity,* the reasons why
such services are required.").

provide funds for the appointment of a criminal investigator fails to adequately set forth the

reasons for this need. Defendant broadly states that

> Witnesses, named in the arrest records and reports disclosed by the
> Government and the Commonwealth to the Defendant in discovery in this
> case, have provided statements to the Government and/or Commonwealth
> and the Defendant seeks to interview these witnesses. As well, there are
> several potential witnesses who have relevant information concerning the
> important background facts in this case, who are critical to a full and effective
> defense to the Defendant's case, which must be interviewed. Counsel
> believes it is necessary to have an investigator appointed to aid in further
> investigation of the case in order to permit statements to be obtained from
> potential witnesses by an individual who is not a party or counsel in the
> instant litigation, and in order to facilitate the investigation.

(Doc. 23-1, at 6-7). This statement merely sets forth a possible need by the defense to

interview certain witnesses or potential witnesses. Defendant does not set forth any reason

why his counsel is unable to speak with these individuals nor does Defendant's motion

explain in any detail any factual issues which necessitate the expertise of the investigator.

In sum, Defendant's broad request fails to reasonably or adequately detail why a criminal

investigator would be necessary to aid in the preparation of an adequate defense.

      With respect to the Presentence Investigative Expert, this request is even more

tenuous. Defendant merely asserts that this expert is necessary "because "[a] presentence

investigation is necessary to enable the Defendant (in the event he is convicted) to present

this Honorable Court with enough information to insure [sic] that it will make a reasoned

determination as to the Defendant's possible sentence and alternative[s] available." (Doc.

23-1, at 8). Defendant fails to offer any specific information as to what he needs a

presentence investigator to find or examine, and advances no reason why the U.S. Probation Office's services and report are insufficient to aid the defendant in any presentence investigation he may need to undertake. Furthermore, the request is premature. Defendant's request on this point is more appropriately decided should Defendant be convicted at trial or enter into a guilty plea prior to that time.

Finally, there is a question in this Court's mind that Defendant is, in fact, indigent, such that he is entitled to public funds for the employment of an investigator or other expert. Although the Court notes that the Federal Public Defender's Office was originally appointed to defend Bangaroo, the Magistrate Judge having found that "said individual is financially [un]able to obtain counsel" (Doc. 12), Bangaroo obtained private counsel several weeks later. The Magistrate Judge's determination was based on a Financial Affidavit submitted to the Court on September 3, 2015. Defendant has not provided the Court with any further financial information since his retention of private counsel. During the oral argument conducted in December, 2016, counsel for Defendant explained that Defendant was not paying him, but rather the defendant's parents. Defendant's counsel further explained that "[Bangaroo] had no job, he had no assets, he had no ownership of real estate."

In response to defense counsel's contention that despite having private counsel, Bangaroo should be considered indigent, the Court permitted him to file a supplemental brief following the hearing. Defendant's supplemental brief cites only to *Ake v. Oklahoma*,

470 U.S. 68 (1985),[9] and provides no case law with respect to when, or how, a defendant who has retained private counsel can be considered indigent for purposes of being eligible for the receipt of state funds.

Here, in light of the insufficient information currently on the record with respect to Bangaroo's financial status, the Court is unable to determine whether Bangaroo can be considered indigent. Regardless, because Bangaroo has not met his burden of establishing the necessity of a criminal investigator to aid in the preparation of an adequate defense or to support his need for a presentence investigative expert at this time, we need not reach the issue of his indigence.

Defendant's motion is therefore denied without prejudice.

## G. Motion VIII – "Motion to Suppress Illegally Obtained Statement or Confession"

In his eighth motion, Defendant appears to be requesting that "any statement obtained from the Defendant" be suppressed. (Doc. 23-1, at 8-9). However, Defendant's request is unclear and overbroad. Defendant does not state what statement(s) he is seeking to preclude, when these statements were made or to whom, and the basis for his

---

[9] In *Ake*, the Supreme Court held that

when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the State the decision on how to implement this right.

*Ake*, 470 U.S. at 83.

request that they be precluded, other than the suggestion that they were illegally obtained. Although Defendant cites *Miranda v. Arizona,* 384 U.S. 436 (1966), he does not assert that he was not properly Mirandized or explain how any statements he made were otherwise "compelled."

In response to this motion, the Government states that it is unaware of any "confession" by Bangaroo. (Doc. 24, at 25). The Government explains that a Kingston Police Department "Narrative" Report concerning the execution of the Search Warrant states that "Bangaroo was advised of his *Miranda* warnings by Detective Palka while he was sitting in the back of the patrol vehicle. Bangaroo stated he didn't live at that house. He was then transported to the Kingston Police Department and placed in a holding cell." (*Id.*). Other than this statement to Detective Palka, the Government asserts it is unaware of any other statements made by Bangaroo.

In light of the Government's representations, and Defendant's lack of clarity and specificity as to what statements he is seeking to suppress, Defendant's motion will be denied.

### H. Motion IX – "Motion to Suppress the Confession of Co-Defendant"

Defendant's next motion summarily and without explanation or analysis requests that the Court "suppress the confession or incriminating statements of co-defendant, Michelle Sebolka." (Doc. 23-1, at 9-10). Citing *Bruton v. United States*, 391 U.S. 123 (1968), Defendant argues that *Bruton* "prohibits the admissibility in a jury trial of a co-defendant's

statement that directly incriminates the defendant under the Sixth Amendment Confrontation Clause." (*Id.* at 10).

This Court cannot agree with Defendant's sweeping characterization of *Bruton's* holding. In *Bruton*, two defendants, Evans and Bruton, were tried jointly for robbery. Although Evans did not testify, the Government introduced into evidence Evans' confession, which stated that Evans and Bruton had committed the robbery together. 391 U.S. at 124. The trial judge instructed the jury that it could consider the confession as evidence against Evans, but not against Bruton. *Id.* at 125. The Supreme Court reversed, holding that despite the limiting instruction, "admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Id.* at 126.

As explained by the Supreme Court,

> In *Bruton* . . . [w]e held that where the jury hears the codefendant's confession implicating the defendant, the codefendant becomes in substance, if not in form, a 'witness' against the defendant. The defendant must constitutionally have an opportunity to 'confront' such a witness. This the defendant cannot do if the codefendant refuses to take the stand.
>
> It was clear in *Bruton* that the 'confrontation' guaranteed by the Sixth and Fourteenth Amendments is confrontation at trial - that is, that the absence of the defendant at the time the codefendant allegedly made the out-of-court statement is immaterial, so long as the declarant can be cross-examined on the witness stand at trial. This was confirmed in *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489, where we said that '(v)iewed historically * * * there is good reason to conclude that the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination.' *Id.*, at 158, 90 S.Ct., at 1935. Moreover, 'where the declarant is

35

not absent, but is present to testify and to submit to cross-examination, our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem.' *Id.*, at 162, 90 S.Ct., at 1937. This is true, of course, even though the declarant's out-of-court statement is hearsay as to the defendant, so that its admission against him, in the absence of a cautionary instruction, would be reversible error under state law. The Constitution as construed in *Bruton*, in other words, is violated only where the out-of-court hearsay statement is that of a declarant who is unavailable at the trial for 'full and effective' cross-examination.

*Nelson v. O'Neil*, 402 U.S. 622, 626-627 (1971).

Thus, as relevant here, *Bruton* does not mandate a suppression of Michelle Sebolka's statements for several reasons. First, Sebolka is not a defendant in this case. As the Government points out, Bangaroo does not have a co-defendant "per se", and although Sebolka was arrested on state charges by the Kingston Police Department, Bangaroo is the sole defendant charged in the present indictment. (Doc. 24, at 25). Second, *Bruton* makes clear that the Confrontation Clause is violated only when the "co-defendant" is unavailable or not produced for trial. Here, the Government states that it "anticipates that Michelle Sebolka will be a witness at time of trial." (*Id.* at 26). If this occurs, *Bruton* is inapplicable as Bangaroo's confrontation rights are not violated because he will be able to cross-examine Sebolka regarding the confession or other statements made by her. Alternatively, if Sebolka does not testify at the time of trial, the Government properly states that at that time the Court can rule on the admissibility of any statements or confession offered in the absence of the "co-defendant" and can determine whether appropriate safeguards can be taken to avoid violation of the confrontation clause. (*Id.*).

36

For the foregoing reasons, Defendant's ninth motion will be denied without prejudice.

## I. Motion XI – "Motion to Compel the Government to Produce Statements of Government Witnesses for Discovery and Inspection Prior to Defense Cross-Examination of Each Such Witness"

Defendant next requests that the Court compel the Government "to produce

statements of Government witnesses for discovery and inspection prior to defense cross-

examination of each such witness." (Doc. 23-1, at 19). Specifically, Defendant requests the

statements of the Government's witnesses prior to the cross-examination of that witness as

well as "any qualifying statement of any complaining witness made to the Victim's Advocate

Office or similar office associated with *any* prosecutor's office." (*Id.*)(italics in original).

Defendant cites in passing to Fed. R. Crim. P. 26.2 and the *Jencks* Act in support of his

request.

With respect to prior statements of witnesses that the Government intends to call at

the time of trial, the Government states that "it intends to provide the same in accord with

Rule 26.2 of the Federal Rules of Criminal Procedure and as statutorily required in Title 18

U.S.C. § 3500." (Doc. 24, at 35).

The Federal Rules provide that

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, must order an attorney for the government or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

37

Fed. R. Crim. P. 26.2(a). The *Jencks* Act further provides that "no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a). Thus, both the *Jencks* Act and the Federal Rules of Criminal Procedure make clear that the Government does not need to turn over the information requested by Defendant in this case until the witness whose statement is at issue has testified on direct examination at trial.[10] As the Third Circuit made clear, "[t]he blunt command of the [*Jencks* Act] together with the unequivocal legislative history has led to unbroken precedent in the Courts of Appeals denying to district courts the power to compel production of the statements of government witnesses until conclusion of direct examination at the trial." *U.S. v. Murphy*, 569 F.2d 771, 773 (3d Cir. 1978). *See also, U.S. v. Moyer*, 726 F.Supp.2d 498, 513 (M.D. Pa. 2010) (denying Defendant's motion for early production of material under the *Jencks* Act and finding that, where the Government had agreed to provide the *Jencks* material three days prior to trial, "[i]t is not within the power of the District Courts to accelerate" the Government's timetable); *U.S. v. Eisenberg*, 773 F.Supp. 662, 683 (D.N.J. 1991) (denying Defendant's motion for disclosure of the pretrial statements of a Government witness prior to that witness's testimony, citing to the *Jencks* Act and Rule

---

[10] The Court acknowledges that Federal Rule 26.2 applies to statements given following direct testimony not only at trial, but also at a suppression hearing and at various other hearings. *See* Fed. R. Crim. P. 26.2(g). However, none of those hearings are at issue here.

38

26.2, and finding that although the Government stated that it would disclose any *Jencks* Act material the day before that witness testified, "it is not required to do so."); *U.S. v. D'Elia*, 2007 WL 2358487, *7 (M.D. Pa. 2007) (denying Defendant's motion under the *Jencks* Act and Rule 26.2 to require the Government to disclose *Jencks* Act material at least thirty days prior to trial).

The Government here has represented that it plans to disclose the materials at issue earlier than the time specified in the *Jencks* Act: that is, with the possible exception of certain limited circumstances, "three days prior to trial." (Doc. 24, at 37). But regardless of whether the statements are ultimately provided before or during trial, the case law makes clear that Defendant's request to supply the material now are premature, and cannot be granted.

Accordingly, any request for early disclosure of *Jencks* material will be denied.

## J. Motion XII – "Motion to Prevent Sentence Based in Whole or Part on Evidence of Any Conviction that is Not Alleged in the Charging Instrument and Proved Beyond a Reasonable Doubt"

With respect to Defendant's twelfth motion – "Motion to Prevent Sentence Based in Whole or Part on Evidence of Any Conviction that is not Alleged in the Charging Instrument and Proved Beyond a Reasonable Doubt" - this motion is clearly premature and these matters may be taken up if Defendant is convicted or pleads guilty and prior to his sentencing. At that time, Defendant will have an opportunity to challenge and object to any characterization of him as being an armed career criminal under 18 U.S.C. § 924(e), which

39

provides that a defendant convicted of being a felon in possession of a firearm in violation of 18 U.S.C. §922(g) is subject to a mandatory sentence of 15 years imprisonment if the defendant has three prior convictions for either a serious drug offense or a violent felony.

The motion will be therefore denied without prejudice.

### K. Motion XIII – "Motion for Leave to File Additional Motions"

Defendant's thirteenth motion, generally requesting "leave to file additional motions" is overly broad and need not be addressed in any detail. The motion does not identify what future motions Defendant is referring to, and the Court will not give the defendant carte-blanche to arbitrarily file motions without a proper legal and procedural basis. Nonetheless, clearly Defendant may file any appropriate and timely motions leading up to the time of trial, as permitted by applicable law and rules of court. Therefore, this motion will be denied without prejudice.

### III. CONCLUSION

For the foregoing reasons, Defendant Aaron Bangaroo's Pre-Trial Motions (Doc. 23) will be decided as set forth in this memorandum opinion. A separate Order follows.

Robert D. Mariani
United States District Judge

40